**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

ABDEL-ILAH ELMARDOUDI, a/k/a
"George Labibe," "Jean-Pierre
Tardelli," "Hussein Mohsen Safieddine"
and "Abdullah,"

          Defendant.

No. 06-CR-112-LRR

**SENTENCING MEMORANDUM**

_____

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

II.    **PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

III.   **SENTENCING PROCESS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

IV.   **SENTENCING CALCULATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
     **A.**    *2000 Guidelines* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
          **1.**    *Defendant is properly scored with a base offense level
               of 6, pursuant to USSG §2F1.1* . . . . . . . . . . . . . . . . . . . . . **8**
          **2.**    *Defendant's offense level should be increased two
               offense levels for more than minimal planning,
               pursuant to USSG §2F1.1(b)(2)* . . . . . . . . . . . . . . . . . . . . . **8**
          **3.**    *Defendant's offense level should be increased to
               offense level 12, pursuant to USSG §2F1.1(b)(5)* . . . . . . . . . **10**
               **a.**    *"Access device"* . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
               **b.**    *"Device-making equipment"* . . . . . . . . . . . . . . . . . . **11**
               **c.**    *"Means of identification"* . . . . . . . . . . . . . . . . . . **12**
               **d.**    *Application* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
                    **i.**    *Access devices* . . . . . . . . . . . . . . . . . . . . . . **14**
                    **ii.**   *Means of identification* . . . . . . . . . . . . . . . . **15**
                    **iii.**  *Enhancement* . . . . . . . . . . . . . . . . . . . . . . . **16**

4.      Defendant's offense level should be increased two
        offense levels for either relocation or sophisticated means,
        pursuant to USSG §2F1.1(b)(6) . . . . . . . . . . . . . . . . . . . .  16

5.      Defendant's offense level should be increased three
        offense levels for his role in the offense, pursuant
        to USSG §3B1.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

B.    2007 Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

1.      Defendant is properly scored with a base offense
        level of 6, pursuant to USSG §2B1.1 . . . . . . . . . . . . . . . .  24

2.      Defendant's offense level should be increased to offense
        level 12 for the involvement of sophisticated means,
        pursuant to USSG §2B1.1(b)(9) . . . . . . . . . . . . . . . . . . . .  24

3.      Defendant's offense level should be increased two offense
        levels for the possession or use of an authentication feature,
        pursuant to USSG §2B1.1(b)(10) . . . . . . . . . . . . . . . . . . .  24

4.      Defendant's offense level should be increased three
        offense levels for his role in the offense, pursuant to
        USSG §3B1.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

C.    Acceptance of Responsibility  . . . . . . . . . . . . . . . . . . . . . . . .  27

D.    Ex Post Facto Clause Analysis . . . . . . . . . . . . . . . . . . . . . . .  29

E.    Criminal History Determination and the 2007 Sentencing
      Guidelines Range  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

1.      The court shall grant an upward departure for under-
        representation of Defendant's criminal history, pursuant
        to USSG §4A1.3(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

2.      Defendant's 2007 Sentencing Guidelines range . . . . . . . . . .  32

F.    Adjustment and Departure Issues  . . . . . . . . . . . . . . . . . . . . .  32

1.      The court shall not grant a downward departure, pursuant to
        USSG §5K2.16 or USSG §5K2.23 . . . . . . . . . . . . . . . . . . .  32
        a.      USSG §5K2.16  . . . . . . . . . . . . . . . . . . . . . . . . .  33
        b.      USSG §5K2.23  . . . . . . . . . . . . . . . . . . . . . . . . .  34

2.      The court shall not grant an upward departure for
        endangering national security, public health or safety,
        pursuant to USSG §5K2.14 . . . . . . . . . . . . . . . . . . . . . . . .  37

3.      The court shall grant an upward departure of nine offense
        levels for the seriousness of an underlying potential charge
        not pursued, under USSG §5K2.21 . . . . . . . . . . . . . . . . . .  38

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

# I. INTRODUCTION

The matter before the court is the sentencing of Defendant Abdel-Ilah Elmardoudi on his plea of guilty to one count of misuse of a fraudulently obtained Social Security number, in violation of 42 U.S.C. § 408(a)(7)(A).

# II. PROCEDURAL BACKGROUND

On August 16, 2006, Defendant was charged in the United States District Court for the Northern District of Iowa in a two-count Indictment. Count I charged Defendant with conspiring, between about June and September of 2001, to commit various offenses involving the making and use of false government identification documents for foreign nationals residing in the United States, in violation of 18 U.S.C. § 371. Count II charged Defendant with, on or about August 30, 2001, using a falsely obtained Social Security number with intent to deceive for the purpose of obtaining a State of Iowa identification card and to obtain a bank account at the Marquette Bank in Cedar Rapids, Iowa, in violation of 42 U.S.C. § 408(a)(7)(A).

On July 9, 2007, Defendant appeared before United States Magistrate Judge Jon S. Scoles and pled guilty to Count 1 of the Indictment. On July 10, 2007, the court entered an order accepting Defendant's plea of guilty to Count II. On October 31, 2007, the United States Probation Office ("USPO") filed a presentence investigation report ("PSIR") and also prepared a sentencing recommendation.

On December 10, 2007, Defendant appeared at a sentencing hearing ("Hearing") before the undersigned. Assistant United States Attorney Kandice Wilcox represented the government. Defendant was personally present and represented by Attorney Christopher Clausen. At the conclusion of the Hearing, the court took under advisement the issues presented and reserved ruling until the entry of this Sentencing Memorandum. On December 28, 2007, the government filed a Sentencing Memorandum ("Government's Memorandum") (docket no. 100), and Defendant filed a Sentencing Memorandum

("Defendant's Memorandum") (docket no. 101). The matters discussed in the instant Sentencing Memorandum are fully submitted and ready for decision.

### III. SENTENCING PROCESS

The Sentencing Guidelines are no longer mandatory. *United States v. Haack*, 403 F.3d 997, 1002 (8th Cir. 2005) (discussing *United States v. Booker*, 543 U.S. 220 (2005)). They are advisory. *Id.* However, the Supreme Court recently explained

> a district court should begin all sentencing proceedings by correctly calculating the applicable [Sentencing Guidelines] range. [*See Rita v. United States*, 127 S. Ct. 2456, 2468 (2007)]. As a matter of administration and to secure nationwide consistency, the [Sentencing Guidelines] should be the starting point and the initial benchmark. The [Sentencing Guidelines] are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district judge] may not presume that the [Sentencing Guidelines] range is reasonable. [*See id.*] [She] must make an individualized assessment based on the facts presented. If [she] decides that an outside-[the Sentencing Guidelines] sentence is warranted, [she] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, [she] must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

*Gall v. United States*, 128 S. Ct. 586, 596-97 (2007); *cf. United States v. Sitting Bear*, 436 F.3d 929, 934 (8th Cir. 2006) (outlining a three-step process). In light of *Gall*'s guidance, the instant Sentencing Memorandum is primarily designed to provide a more detailed understanding of the court's reasoning on the contested advisory Sentencing Guidelines

4

issues; it is not comprehensive. For example, the court's analysis of each of the factors at 18 U.S.C. § 3553(a) is outside the scope of this document. The Supreme Court has stated:

> The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon the circumstances. Sometimes a judicial opinion responds to every argument; sometimes it does not; sometimes a judge simply writes the word "granted" or "denied" on the face of a motion while relying upon context and the parties' prior arguments to make the reasons clear. The law leaves much, in this respect, to the judge's own professional judgment.

*Rita*, 127 S. Ct. at 2468. What is important is that "[t]he sentencing judge . . . set forth enough to satisfy the appellate court that [she] has considered the parties' arguments and has a reasoned basis for exercising [her] own legal decisionmaking authority." *Id.* (citing *United States v. Taylor*, 487 U.S. 326, 336-37 (1988)).

## IV. SENTENCING CALCULATIONS[1]

The Sentencing Guidelines direct the court to use the edition of the Sentencing Guidelines in effect on the date a defendant is sentenced, USSG §1B1.11(a) (2007), unless such use would result in a higher calculated sentence and thus run afoul of the Ex Post Facto Clause. USSG §1B1.11(b)(1). In that case, "the court shall use the [Sentencing Guidelines] in effect on the date that the offense of conviction was committed." USSG §1B1.11(b)(1). Application Note 2 explains:

> [u]nder [USSG §1B1.11(b)(1)], the last date of the offense of conviction is the controlling date for [Ex Post Facto Clause] purposes. For example, if the offense of conviction (i.e., the conduct charged in the count of the indictment or information

---

[1] For sentencing purposes, the court concludes that neither party seriously disputed the PSIR's description of Defendant's offense conduct, as described in paragraphs 20 to 32 of the PSIR, and that such description is accurate. Further, Defendant does not suggest or argue that the evidence presented at the Hearing was factually inaccurate.

of which the defendant was convicted) was determined by the court to have been committed between October 15, 1991 and October 28, 1991, the date of October 28, 1991 is the controlling date for [Ex Post Facto Clause] purposes. . . .

USSG §1B1.11, cmt. (n.2) (emphasis in original).

The 2007 edition of the Sentencing Guidelines ("2007 Guidelines") is presently in effect.[2] Count II, the offense of conviction, charged that Defendant committed the offense on or about August 30, 2001, during which time the 2000 edition of the Sentencing Guidelines ("2000 Guidelines") was in effect. The issue, then, is whether application of the 2007 Guidelines would result in a higher calculated sentence. USSG §1B1.11(b)(1).

The sentencing calculation, therefore, consists of six parts. First, the court will calculate Defendant's offense level under Chapters 2 and 3 of the 2000 Guidelines. There are five issues raised under this calculation: whether (1) Defendant is properly scored with a base offense level of 6, pursuant to §2F1.1; (2) Defendant's offense level should be increased two offense levels for more than minimal planning, pursuant to §2F1.1(b)(2); (3) whether Defendant's offense level should be increased to offense level 12, pursuant to §2F1.1(b)(5); (4) Defendant's offense level should be increased two offense levels for either relocation or sophisticated means, pursuant to §2F1.1(b)(6); and (5) Defendant's offense level should be increased three offense levels for his role in the offense, pursuant to §3B1.1(b).

Second, the court will calculate Defendant's offense level under Chapters 2 and 3 of the 2007 Guidelines. There are four issues raised under this calculation: whether (1) Defendant is properly scored with a base offense level of 6, pursuant to §2B1.1; (2) Defendant's offense level should be increased to offense level 12 for the involvement of

---

[2] The USPO discussed the 2006 edition of the Sentencing Guidelines ("2006 Guidelines"), because the 2006 Guidelines were in effect when the USPO prepared the PSIR. The 2006 and 2007 Guidelines are identical for present purposes.

sophisticated means, pursuant to §2B1.1(b)(9); (3) Defendant's offense level should be increased two offense levels for the possession or use of an authentication feature, pursuant to §2B1.1(b)(10); and (4) Defendant's offense level should be increased three offense levels for his role in the offense, pursuant to §3B1.1(b).

Third, the court shall separately analyze whether Defendant is entitled to a three-level reduction for acceptance of responsibility, pursuant to §3E1.1. Section 3E1.1 in the 2000 Guidelines is substantially identical to §3E1.1 in the 2007 Guidelines. Accordingly, the court collapses the analyses.

Fourth, the court will engage in an Ex Post Facto Clause analysis regarding the calculations under the 2000 Guidelines and the 2007 Guidelines.

Fifth, the court will: (1) address whether an upward departure should be granted for under-representation of Defendant's criminal history, pursuant to §4A1.3(a)(1); and (2) calculate Defendant's advisory sentence under the applicable Sentencing Guidelines.

Sixth, the court will address three adjustment or departure issues in the Sentencing Guidelines. Those issues include: (1) whether the court should grant a sentencing adjustment for an existing undischarged term of imprisonment, pursuant to §5G1.3; (2) whether the court should grant an upward departure for endangering national security, public health or safety, pursuant to §5K2.14; and (3) whether the court should grant an upward departure for the seriousness of an underlying charge not pursued, under §5K2.0 or §5K2.21.

To the extent necessary, the court makes factual findings under a preponderance of the evidence standard. *See United States v. Bah*, 439 F.3d 423, 426 n.1 (8th Cir. 2006) ("[J]udicial fact-finding using a preponderance of the evidence standard is permitted provided that the [Sentencing Guidelines] are applied in an advisory manner."). The government generally bears the burden of proof on the instant advisory Sentencing Guidelines issues, including the upward departure matters. Defendant bears the burden

of proof with respect to his request for a reduction for acceptance of responsibility and his request for a downward adjustment. *Compare United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir. 2001) (stating that the government bears the burden to prove sentencing enhancements), *with United States v. Lussier*, 423 F.3d 838, 843 (8th Cir. 2005) (holding that defendant "has the burden of proving that a reduction in the offense level should apply").

### A. 2000 Guidelines

**1.    Defendant is properly scored with a base offense level of 6, pursuant to USSG §2F1.1**

Defendant pled guilty to one count of misuse of a fraudulently obtained Social Security number, in violation of 42 U.S.C. § 408(a)(7)(A). The 2000 Guidelines provide that the applicable guideline for a violation of 42 U.S.C. § 408(a)(7)(A) is §2F1.1. USSG App. A (2000). Section 2F1.1(a) sets the base offense level at **6**. USSG §2F1.1(a). Therefore, Defendant's base offense level is **6** under the 2000 Guidelines.

**2.    Defendant's offense level should be increased two offense levels for more than minimal planning, pursuant to USSG §2F1.1(b)(2)**

The 2000 Guidelines provide that a defendant's offense level should be increased by two levels "[i]f the offense involved . . . more than minimal planning . . . ." USSG §2F1.1(b)(2)(A). The Commentary to the 2000 Guidelines explains that

> "[m]ore than minimal planning" means more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense, other than conduct to which §3C1.1 (Obstructing or Impeding the Administration of Justice) applies.
>
> "More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses. . . .

USSG §1B1.1, cmt. (n.1(f)); *see id*. §2F1.1, cmt. (n.2) (incorporating definition at §1B1.1).

Defendant argues his scheme did not involve more than minimal planning. Defendant primarily relies on *United States v. Hance*, 501 F.3d 900 (8th Cir. 2007). In *Hance*, the Eighth Circuit Court of Appeals reviewed an enhancement for use of "sophisticated means" under §2F1.1(b)(6)(C) rather than for "more than minimal planning" under §2F1.1(b)(2)(A). 501 F.3d at 909. It noted that a "garden-variety" mail-fraud scheme, in which a defendant establishes "a post-office box in [his] own neighborhood under an assumed name[,]" normally does not involve the use of sophisticated means. *Id*. at 911.

Defendant's reliance on *Hance* is misplaced. The Eighth Circuit Court of Appeals explained that the use of false names to open several accounts is not "purely opportune" and supports a finding of more than minimal planning. *United States v. Lim*, 235 F.3d 382, 384 (8th Cir. 2000); *see also United States v. Lublin*, 981 F.2d 367, 370 (8th Cir. 1992) (noting that detailed plans to conceal misuse of a social security number supports finding of more than minimal planning); *United States v. Hearrin*, 892 F.2d 756, 759 (8th Cir. 1990) (upholding an enhancement under §2F1.1(b)(2)(A) because the defendants used a false business name and opened accounts, including a post office box, with that business name). The enhancement may also apply if the criminal scheme occurs over a period of several months rather than as a discrete incident. *See United States v. Earles*, 955 F.2d 1175, 1181 (8th Cir. 1992) (holding that a "fraudulent pattern of activity extend[ing] over a period of at least eight months" supported finding of more than minimal planning). In *Hance*, the Eighth Circuit Court of Appeals applied the more exacting standard of "sophisticated means," not the standard for "more than minimal planning." Further, unlike the defendant in *Hance*, Defendant did not establish a single post office box in his own neighborhood, 501 F.3d at 911; rather, Defendant and Yousseff Hmimssa

("Hmimssa") established multiple post office or commercial mailboxes in multiple cities in the Northern District of Iowa, including Iowa City, Cedar Rapids, Dubuque and Waterloo, under multiple aliases, including "Jean Pierre Tardelli" and "Hussein Mohsen Safieddine," *see* PSIR, at ¶¶ 23 & 25; Hearing Exs. 14-18, 100, 102-104, 122, 127. Defendant, therefore, did not engage in "purely opportune" criminal conduct. USSG §1B1.1, cmt. (n.1(f)). Defendant engaged in a "fraudulent pattern of activity" over a period of at least several months in 2001, *see Earles*, 955 F.2d at 1181, and used multiple post office and commercial mailboxes under multiple names in multiple cities to conceal the scheme, *see Lim*, 235 F.3d at 384; *Lublin*, 981 F.2d at 370; *Hearrin*, 892 F.2d at 759. Defendant's criminal conduct is hardly "garden variety." *See Hance*, 501 F.3d at 911.

Accordingly, Defendant's offense level should be increased by **two** offense levels for more than minimal planning, pursuant to USSG §2F1.1(b)(2). This brings Defendant's adjusted offense level to **8** under the 2000 Guidelines.

### 3. *Defendant's offense level should be increased to offense level 12, pursuant to USSG §2F1.1(b)(5)*

Section 2F1.1. of the 2000 Guidelines provides:

[i]f [such] offense involved—

(A) the possession or use of any device-making equipment;

(B) the production or trafficking of any unauthorized access device or counterfeit access device; or

(C) (i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification; or (ii) the possession of 5 or more means of identification that unlawfully were produced from another means of identification or obtained by the use of another means of identification,

increase by **2** levels. If the resulting offense level is less than level **12**, increase to level **12**.

USSG §2F1.1(b)(5) (emphasis in original).  Because the definition of the term "device-making equipment" includes a reference to the term "access device," the court shall consider the latter term first.  USSG §2F1.1, cmt. (n.15).  Then it shall consider the former term, followed by the term "means of identification."  *Id*.

### a.    *"Access device"*

Section 2F1.1 adopts the definition of "access device" in 18 U.S.C. § 1029(e)(3)." *Id*.  Section 1029, in part, provides:

> (1) the term "access device" means any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument);
>
> (2) the term "counterfeit access device" means any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device;
>
> (3) the term "unauthorized access device" means any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud; . . . .

18 U.S.C. § 1029(e)(1)-(3).

### b.    *"Device-making equipment"*

The Commentary to §2F1.1 explains that "'[d]evice-making equipment' . . . has the meaning given that term in 18 U.S.C. § 1029(e)(6) . . . ."  USSG §2F1.1, cmt. (n.15). Section 1029(e)(6), in turn, defines "device-making equipment" as "any equipment, mechanism, or impression designed or primarily used for making an access device or a

counterfeit access device . . . ."  18 U.S.C. § 1029(e)(6).

### c. *"Means of identification"*

"'Means of identification' has the meaning given that term in 18 U.S.C. § 1028(d)(3), except that such means of identification shall be of an actual (i.e., not fictitious) individual other than the defendant or a person for whose conduct the defendant is accountable under §1B1.3 (Relevant Conduct)."  USSG §2F1.1, cmt. (n.15).  Section 1028(d)(3) explains that

> the term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any
>
> (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;
>
> (B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;
>
> (C) unique electronic identification number, address, or routing code; or
>
> (D) telecommunication identifying information or access device (as defined in section 1029(e)). . . .

18 U.S.C. § 1028(d)(3).

The Eighth Circuit Court of Appeals insisted that the term "means of identification" must relate to a specific individual, by means of, for example, a "unique electronic identification number, address, or routing code."  *United States v. Scott*, 448 F.3d 1040, 1046 (8th Cir. 2006).  However, in applying the successor to §2F1.1(b)(5),[3] the Ninth

---

[3] In November of 2001, §2F1.1 was consolidated with §2B1.1, including the
(continued...)

Circuit Court of Appeals held that there is no requirement that both the original and the subsequently produced documents relate to an actual individual; for example, the enhancement applies in a case where the defendant uses valid social security numbers to create other fraudulent identification documents under fictitious names. *United States v. Melendrez*, 389 F.3d 829, 834 (9th Cir. 2004); *see also United States v. Oates*, 427 F.3d 1086, 1090 (8th Cir. 2005) (quoting *Melendrez* with approval). The Third Circuit Court of Appeals held that merely altering existing identification documents to create "any alternate hybrid[,]" *e.g.*, an otherwise valid driver's license with the lawful holder's photograph replaced with a photograph of the defendant, triggered the enhancement. *United States v. Newsome*, 439 F.3d 181, 185 (3d Cir. 2006) (quotations omitted). Additionally, a customer's consent to produce a new means of identification based on an existing means of identification does not bear on whether the enhancement applies. *See United States v. Sash*, 396 F.3d 515, 521 (8th Cir. 2005) ("Despite the fact that [the defendant] may have received permission from various police officers—but not the police commissioner or department—to produce a duplicate badge at the officer's request, [the defendant] was still unlawfully producing a means of identification from another means of identification under the plain meaning of" the Sentencing Guideline. (internal quotations omitted).); *cf. United States v. Norwood*, No. 04-00236-CR-1-1, 2006 WL 952330, *1 (11th Cir. Apr. 13, 2006) (holding that the absence of injury to any person did not preclude application of the enhancement for the defendant's use of names of deceased family members to open bank accounts).

### d. Application

The court holds that Defendant qualifies for the enhancement under

---

[3](…continued)

language and statutory references regarding the definition of the term means of identification.

§2F1.1(b)(5)(B) and, in the alternative, under §2F1.1(b)(5)(C). The court assumes without deciding that Defendant does not qualify under §2F1.1(b)(5)(A).

### i.    *Access device*s

Defendant produced or trafficked an unauthorized access device or counterfeit access device, because the various fraudulent identification documents, *i.e.*, social security cards and Iowa identification cards, that Defendant, Ibrahim Sidi ("Sidi") and Hmimssa possessed or helped their customers obtain qualify as access devices. The court is persuaded by the reasoning of other Circuit Courts of Appeals that the term access device "is broad enough to include social security numbers with corresponding names, birth dates, and addresses[.]" *Komolafe*, No. 06-1683, 2007 WL 2469447, *3 (3d Cir. Aug. 31, 2007); *see also Oladimeji*, 463 F.3d 152, 153 (2d Cir. 2006) (noting that term access device includes social security numbers); *Sorensen*, No. 90-30183, 1991 WL 126623, *2 (9th Cir. July 10, 1991). The holdings in *Komolafe*, *Oladimeji* and *Sorensen* are useful, because each involved social security numbers, which were subsequently used to obtain credit. *See Komolafe*, 2007 WL 2469447 at *3; *Oladimeji*, 463 F.3d at 153; *Sorensen*, 1991 WL 126623 at *2. Defendant applied for social security cards under different names both in Cedar Rapids and in Marshalltown, Iowa. PSIR at ¶ 25. Defendant was "able to open [a] fraudulent bank account[,]" *Komolafe*, 2007 WL 2469447 at *3, with his unauthorized social security card and Iowa identification card, PSIR at ¶ 26. Defendant, Hmimssa and Sidi assisted in at least 29 instances of fraudulent social security card applications. *Id*. at ¶ 24. Defendant further assisted their customers by filling out their applications for social security cards and "sometimes accompanied them to the Social Security office." *Id*., at ¶ 23. Defendant's conduct, therefore, involved the "production or trafficking of . . . unauthorized [social security cards and Iowa identification cards] . . . ." *See* USSG §2F1.1(b)(5)(B). Although none of these documents itself permits access to a "funds transfer system[]," *Lee*, 815 F.2d at 973, their use is analogous to "counterfeit[ing] credit cards [or] the unauthorized use of account numbers or access

14

codes to banking system accounts[,]" H.R. Rep. No. 98-894, 1984 WL 37453, at 4 (1984). Social security cards and state identification cards "can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds." 18 U.S.C. § 1029(e)(1). Therefore, the enhancement under §2F1.1(b)(5)(B) is appropriate.

## ii. *Means of identification*

Even if Defendant did not qualify for the enhancement under §2F1.1(b)(5)(B), Defendant nonetheless transferred or possessed, without authorization, a means of identification to produce or obtain another means of identification. USSG §2F1.1(b)(5)(C)(i). Defendant, Hmimssa and Sidi altered or forged visas and I-94s for their customers for use with such customers' existing passports. PSIR at ¶¶ 22 & 23. Defendant, Hmimssa and Sidi assisted in at least 29 instances of fraudulent social security card applications. *Id*. at ¶ 24. The social security cards that Defendant, Hmimssa and Sidi assisted their customers in obtaining, *id*. at ¶¶ 23 & 24, are means of identification, *see* 18 U.S.C. § 1028(d)(3).

Defendant's conduct qualifies for this enhancement because "such means of identification [were] of [] actual (i.e., not fictitious) individual[s] other than [Defendant] or a person for whose conduct [Defendant] is accountable under §1B1.3 (Relevant Conduct)." USSG §2F1.1, cmt. (n.15). Defendant was not accountable for the actions of his customers, *i.e.*, the customers were not part of the criminal scheme among Defendant, Hmimssa and Sidi. *See* PSIR, at ¶ 23 (describing the criminal scheme, its profit-making purpose and its three members and their functions). It is immaterial that Defendant's customers consented to the unlawful production, *see Sash*, 396 F.3d at 521; *Norwood*, 2006 WL 952330 at *1, or that fraudulent visas or I-94s were appended to the customers' otherwise valid passports, *see Newsome*, 439 F.3d at 185 (holding that altered or "hybrid" identification documents qualify for sentencing enhancement). For these

reasons, Defendant's offense level should be enhanced under §2F1.1(b)(5)(C).

### iii.  Enhancement

Accordingly, the court holds that an enhancement under §2F1.1(b)(5) is appropriate. This brings Defendant's adjusted offense level to **12** under the 2000 Guidelines.

### 4.  Defendant's offense level should be increased two offense levels for either relocation or sophisticated means, pursuant to USSG §2F1.1(b)(6)

Section 2F1.1(b)(6) provides for a two-level increase "[i]f (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; . . . or (C) the offense otherwise involved sophisticated means . . . ." USSG §2F1.1(b)(6). To impose the enhancement of §2F1.1(b)(6)(A), the court must find that the defendant: (1) relocated from one jurisdiction to another; (2) moved a fraudulent scheme; and (3) did so for the purpose of evading law enforcement or regulatory officials. *United States v. Smith*, 367 F.3d 737, 740 (8th Cir. 2004), *vacated on other grounds*, 543 U.S. 1103 (2005). A defendant's argument that he did not generate fraudulent documents himself is of no moment if the defendant had "de facto control" over them. *United States v. Evergreen Int'l*, 206 F. App'x. 71, 79 (2d Cir. 2006); *see also id*. (holding that the defendant merited "sophisticated means" enhancement under §2F1.1(b)(6), even though he did not "generate" or "design" fraudulent trading records, because he had "de facto control" over the records). With respect to §2F1.1(b)(6)(C), "sophisticated means"

> means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction would ordinarily indicate sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore bank accounts also ordinarily would indicate sophisticated means.

USSG §2F1.1, cmt. (n. 18).

During the period of the fraudulent scheme, Defendant traveled through the states of Minnesota, Michigan, Illinois, Iowa and North Carolina. PSIR at ¶¶ 21& 32. After his flight from the Northern District of Iowa, he assisted approximately eight other customers in Tennessee, New York, Connecticut and Pennsylvania. *Id*. at ¶ 32. He routinely brought customers from Chicago to Iowa to fraudulently obtain social security numbers. *Id*. at ¶ 23. Defendant, in concert with Hmimssa and Sidi, primarily manufactured fraudulent visas and I-94s for their customers to apply for social security cards. *Id*. Upon his arrest, Defendant admitted that the I-94s in his possession were for the purpose of obtaining additional fraudulent identification documents. *Id*. at ¶ 30. Defendant used at least three aliases while he lived in Cedar Rapids, applying for social security cards under different names both there and in Marshalltown, Iowa. *Id*. at ¶ 24. After Hmimssa's arrest and subsequent to Defendant's flight from Iowa, Defendant was discovered with at least two dozen fraudulent identification documents. *Id.*, at ¶ 31 n.2; *see also* Hearing Exs. 166-189.

Defendant's conduct plainly meets the standard for relocation of a fraudulent scheme under §2F1.1(b)(6)(A). Defendant traveled through several states during the course of his scheme, especially between Iowa and Illinois to serve his customers. *See Smith*, 367 F.3d at 740. Defendant's possession of at least two dozen fraudulent identification documents at his arrest in North Carolina leads the court to conclude that his scheme continued in that jurisdiction, among others. *See id*. Defendant fled from Iowa upon Hmimssa's arrest to escape a similar fate. *See id.*

In the alternative, Defendant also qualifies for the increase under §2F1.1(b)(6)(C) for the use of sophisticated means. A defendant's offense of conviction may involve "sophisticated means" under §2F1.1(b)(6)(C), even if "certain aspects of the defendant's scheme were not complex or intricate . . . ." *United States v. Edelman*, 458 F.3d 791,

816 (8th Cir. 2006). The enhancement applies if a "defendant's 'total scheme was undoubtedly sophisticated.'" *Id.* (quoting *United States v. Halloran*, 415 F.3d 940, 945 (8th Cir. 2005)). Indicia of sophisticated means include: the use of multiple types of fraudulent documents, *id.*; *Halloran*, 415 F.3d at 945; the use of fraudulent supporting documentation, *United States v. Okolo*, 82 F. App'x. 834, 837 (4th Cir. 2003); the use of multiple false identities, *United States v. Coleman*, 83 F. App'x. 881, 882 (9th Cir. 2003); the manufacture of false documentation, *United States v. McIntosh*, 52 F. App'x. 678, 681 (6th Cir. 2002); the use of different branches of the same government office to avoid suspicion, *United States v. Harvey*, 413 F.3d 850, 853 (8th Cir. 2005) (applying successor §2B1.1(b)(9)(C)); travel through several jurisdictions subsequent to the fraud, *id.*; and repetitive and coordinated conduct, *United States v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005) (applying successor §2B1.1(b)(8)). Here, Defendant used multiple types of fraudulent documents, *see Edelman*, 458 F.3d at 816; *Halloran*, 415 F.3d at 945; he used fraudulent supporting documentation to obtain other identification, *see Okolo*, 82 F. App'x. at 837; he used multiple false identities, *see Coleman*, 83 F. App'x. at 882; he manufactured false documentation, *see McIntosh*, 52 F. App'x. at 681; he went to different branches of the same government office, *see Harvey*, 413 F.3d at 853 (applying successor §2B1.1(b)(9)(C)); he traveled through several jurisdictions during the course of the fraudulent scheme, including after Hmimssa's arrest, *see id.*; and the manufacture and sale scheme was coordinated and repetitive, *see Finck*, 407 F.3d at 915 (applying successor §2B1.1(b)(8)).

Accordingly, the court holds that Defendant's offense level should be increased **two** offense levels for the use of sophisticated means, under §2F1.1(b)(6)(A) or (C). This brings Defendant's adjusted offense level to **14** under the 2000 Guidelines.

### 5. *Defendant's offense level should be increased three offense levels for his role in the offense, pursuant to USSG §3B1.1(b)*

The 2000 Guidelines state that, "[b]ased on the defendant's role in the offense,

increase the offense level as follows: . . . (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." USSG §3B1.1(b). The Commentary further explains:

> 1. A "participant" is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant.

> 2. To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

> 3. In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

USSG §3B1.1(b), cmt. (n.1-3). In assessing whether a defendant qualifies as a manager or supervisor, the court should consider

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

USSG §3B1.1(b), cmt. (n.4). The Commentary further explains that, "[i]n relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in

planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility." USSG §3B1.1, cmt. (backg'd.).

In the document fraud context, the Eighth Circuit Court of Appeals held that a defendant was entitled to the three-level increase because "she was one of the core members of the conspiracy and chiefly responsible for the manufacture and distribution of many of the fraudulent documents." *United States v. Telemaque*, 934 F.2d 169, 171 (8th Cir. 1991). More specifically, a defendant may qualify as a manager or supervisor if there is evidence that he "initiated transactions, negotiated prices, [or] recruited individuals" on behalf of the criminal scheme. *United States v. Russell*, 913 F.2d 1288, 1294 (8th Cir. 1990); *see also United States v. Flores*, 73 F.3d 826, 836 (8th Cir. 1996) (noting that recruitment of buyers and financing of travel were indicative of a managerial or supervisory role under §3B1.1(b)); *United States v. Adipietro*, 983 F.2d 1468, 1473 (8th Cir. 1993) (holding that recruiting of accomplices is suggestive of a managerial or supervisory role under §3B1.1(b)); *United States v. Wichmann*, 958 F.2d 240, 242 (8th Cir. 1992) (holding that recruiting of accomplices, as well as distribution of narcotics to about 75 customers, were indicative of managerial or supervisor role under §3B1.1(b)). Also relevant is whether a defendant paid for the "supplies and materials" for the criminal endeavor. *United States v. Hendrickson*, 65 F. App'x. 609, 610 (9th Cir. 2003). The Eighth Circuit Court of Appeals noted that control over others involved in a criminal scheme is not necessary to a finding that the enhancement applies and held that, "[t]o be a manager, a defendant in a drug conspiracy need not control or manage the activities of the co-conspirators—it is sufficient that the facts show that the defendant managed the criminal activity." *United States v. Lawrence*, 918 F.2d 68, 72 (8th Cir. 1990).

Customers do not normally qualify as participants for purposes of §3B1.1 unless the defendant exercises control over his customers. *United States v. Del Toro-Aguilera*, 138

F.3d 340, 343 (8th Cir. 1998); *see also United States v. McMullen*, 86 F.3d 135, 138 (8th Cir. 1996) (noting that mere customers do not qualify as participants for purposes of §3B1.1); *United States v. Capps*, 952 F.2d 1026, 1028 (8th Cir. 1991) (same). Other Circuit Courts of Appeals agree. *See United States v. Egge*, 223 F.3d 1128, 1133 (9th Cir. 2000) ("[M]erely purchasing drugs from the seller, without more, does not qualify that customer as a participant for the purposes of the [§3B1.1] enhancement."); *United States v. Belletiere*, 971 F.2d, 961, 970 (3d Cir. 1992) ("Before a . . . customer may be deemed to have been a 'controlled' participant under [§3B1.1], the government must prove at least an interdependence between the defendant and the . . . customer that would support an inference that the . . . customer for personal use is answerable to the defendant.").

The Eighth Circuit Court of Appeals held that, under §3B1.1, "any criminal activity with five or more participants [is] extensive as a matter of law." *United States v. Kirkeby*, 11 F.3d 777, 778 (8th Cir. 1993). However, a defendant may still merit a role enhancement under §3B1.1, even in cases involving fewer than five participants, if the activity is otherwise extensive, *i.e.*, "the sentencing court must find that the criminal activity involved five or more participants *or* be otherwise extensive." *United States v. Harry*, 960 F.2d 51, 54 (8th Cir. 1993) (emphasis in original). "The otherwise extensive language refers to the number of persons involved in the operation, . . . and includes all persons involved during the course of the entire offense, . . . including outsiders who did not have knowledge of the facts." *United States v. West*, 942 F.2d 528, 531 (8th Cir. 1991) (citations and quotations omitted); *see also id.* (holding that eight non-participants, in addition to the two co-conspirators, sufficed for sentencing enhancement as extensive criminal activity). The First Circuit Court of Appeals explained that

> the sentencing court is free to consider the use of unwitting outsiders in determining if a criminal enterprise is "extensive" within the contemplation of [§3B1.1]. . . . The extensiveness of a criminal activity is not necessarily a function of the precise number of persons, criminally culpable or otherwise, engaged in the activity. Rather, an inquiring court must

> examine the totality of the circumstances, including not only
> the number of participants but also the width, breadth, scope,
> complexity, and duration of the scheme.

*United States v. Dietz*, 950 F.2d 50, 53 (1st Cir. 1991).

In early 2001, Defendant and Sidi were obtaining fraudulent identification documents for foreign national customers. PSIR, at ¶ 21. During that same time period, Defendant met Hmimssa, whom Defendant learned was skilled at forging identification documents on the computer. *Id.* Thereafter, Hmimssa joined Sidi and Defendant in providing fraudulent identification documents to customers in Chicago; Hmimssa primarily worked on creating the false documents for Sidi's customer network. *Id.*, at ¶ 23. For his part, Defendant purchased materials and equipment necessary to produce fraudulent identification documents. *Id.*, at ¶ 22. Morever, Defendant assisted customers by transporting them to Iowa to apply for social security cards with their fraudulent identification documents; the scheme resulted in at least 29 such applications. *Id.*, at ¶ 24. Shortly after September 11, 2001, Defendant told Hmimssa to destroy the documents, equipment and materials involved in the scheme, but Hmimssa failed to do so; a subsequent search of a storage locker rented by Hmimssa revealed a computer, keys to post office boxes, passports, a printer and other materials and equipment used to produce false identification documents. *Id.*, at ¶¶ 26 & 27. On November 4, 2002, *i.e.*, over a year later, Defendant was finally captured in North Carolina; at that time, he possessed dozens of fraudulent documents, including passports, I-94s, Puerto Rican birth certificates, social security cards in various names, $83,020 in cash and $4,600 in money orders. *Id.*, at ¶ 30. Excluding documents stored on the computer seized from Hmimssa's storage locker, the documents seized in the investigation include 21 social security cards, 22 I-94s, nine U.S. birth certificates, ten driver's licenses, 28 passports, 12 visas, seven foreign travel documents, one blank Mexican birth certificate, one blank Lebanese passport, 87 blank I-94s and one blank British passport. *Id.* at ¶ 31. In October of 2004, during a

multi-agency proffer, Defendant admitted his participation in the scheme to create fraudulent identification documents, used primarily to obtain social security cards. *Id*. at ¶ 32. After his flight from the Northern District of Iowa, Defendant assisted approximately eight other customers in Tennessee, New York, Connecticut and Pennsylvania. *Id*.

Defendant qualifies as a manager or supervisor for purposes of §3B1.1(b). Defendant "was one of the core members of the conspiracy and chiefly responsible for the manufacture and distribution of many of the fraudulent documents." *Telemaque*, 934 F.2d at 171. "[T]he facts show that [Defendant] managed the criminal activity." *Lawrence*, 918 F.2d at 72. He paid for the "supplies and materials" for the criminal endeavor. *Hendrickson*, 65 F. App'x. at 610. He "initiated transactions, negotiated prices [and] recruited" Hmimssa to the scheme. *Russell*, 913 F.2d at 1294; *see also Adipietro*, 983 F.2d at 1473 (holding that recruitment is evidence of managerial or supervisor role); *Wichmann*, 958 F.2d at 242 (same). He met with customers and assisted in their travel to Iowa. *See Flores*, 73 F.3d at 836. Therefore, Defendant qualifies as a manager or supervisor.

Assuming without deciding that the scheme did not involve five or more participants, Defendant still qualifies for the enhancement under §3B1.1(b). Defendant's criminal activity was extensive. Defendant participated in a broad and complex scheme. *See Dietz*, 950 F.2d at 53; *Mullins*, 992 F.2d at 1479. Defendant, Sidi and Hmimssa manufactured, sold or possessed scores of fraudulent documents aimed at perpetrating subsequent frauds upon the government. Defendant's criminal activity continued for a period of nearly two years prior to his arrest. *See Patasnik*, 89 F.3d at 69. He assisted dozens of customers in fraudulent attempts to obtain social security cards in many states. *See Briscoe*, 65 F.3d at 590; *Rodriguez*, 981 F.2d at 1200.

Accordingly, Defendant's offense level should be increased by **three** offense levels

for his aggravating role in the offense, pursuant to §3B1.1(b).  This brings Defendant's total adjusted offense level—before any reduction for acceptance of responsibility—to **17** under the 2000 Guidelines.

### B.  2007 Guidelines

**1.     Defendant is properly scored with a base offense level of 6, pursuant to USSG §2B1.1**

The 2007 Guidelines provide that the applicable guideline for a violation of 42 U.S.C. § 408(a)(7)(A) is §2B1.1.  USSG App. A (2007).  Section 2B1.1 sets the base offense level at **6**, unless the defendant was convicted of an offense that has a statutory maximum term of imprisonment of twenty years or more.  USSG §2B1.1(a) (emphasis in original).  Section 408(a)(7)(A) has a statutory maximum term of imprisonment of five years.  Therefore, Defendant's base offense level is **6** under the 2007 Guidelines.

**2.     Defendant's offense level should be increased to offense level 12 for the involvement of sophisticated means, pursuant to USSG §2B1.1(b)(9)**

Under §2B1.1(b)(9) of the 2007 Guidelines, if the "offense otherwise involved sophisticated means, increase by **2** levels.  If the resulting offense level is less than level **12**, increase to level **12**."  USSG §2B1.1(b)(9)(C) (emphasis in original).  In all relevant respects, §2B1.1(b)(9)(C) (2007) is identical to §2F1.1(b)(6)(C) (2000).  Indeed, in November of 2001, §2F1.1 was consolidated with §2B1.1.  *United States v. Killgo*, 397 F.3d 628, 630 n.3 (8th Cir. 2005).  Therefore, for the reasons discussed at Part IV.A.4 herein, Defendant's offense level should be increased to level **12**, pursuant to §2B1.1(b)(9)(C) under the 2007 Guidelines.

**3.     Defendant's offense level should be increased two offense levels for the possession or use of an authentication feature, pursuant to USSG §2B1.1(b)(10)**

Section 2B1.1(b)(10) states

> If the offense involved (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; (B)

the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase by **2** levels. If the resulting offense level is less than level **12**, increase to level **12**.

USSG §2B1.1(b)(10) (emphasis in original). The court holds that Defendant qualifies for the enhancements related to an unauthorized or counterfeit access device and the means of identification to produce or obtain another means of identification for the reasons explained above in Part IV.A.3. Such portions of §2B1.1(b)(10) (2007) are identical in all relevant respects to §2F1.1(b)(5) (2000). This brings Defendant's adjusted offense level to 14 under the 2007 Guidelines.[4]

---

[4] In any event, Defendant also qualifies for the enhancement under §2B1.1(b)(10) if he possessed or used an authentication feature, pursuant to §2B1.1(b)(10)(A)(ii), or if he produced or trafficked any authentication feature, pursuant to §2B1.1(b)(10)(B)(ii). The Commentary to §2B1.1(b)(10) states that, "[f]or purposes of subsection (b)(10): '[a]uthentication feature' has the meaning given that term in 18 U.S.C. § 1028(d)(1)." USSG §2B1.1, cmt. (n.9). Section 1028(d)(1) defines authentication feature as

> any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing authority on an identification document, document-making implement, or means of identification to determine if the document is counterfeit, altered, or otherwise falsified . . . .

18 U.S.C. § 1028(d)(1). Congress explained that authentication features "are the holograms, symbols, codes, etc., used by the issuing authority to verify that an ID is authentic." H.R. Conf. Rep. No. 108-66, 68 (2003). The term identification document is defined in subsection (3) as

(continued...)

### 4. Defendant's offense level should be increased three offense levels for his role in the offense, pursuant to USSG §3B1.1(b)

The 2007 Guidelines state that, "[b]ased on the defendant's role in the offense, increase the offense level as follows: . . . (b) [i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels." USSG §3B1.1(b) (emphasis in original). In other words, §3B1.1(b) in the 2007 Guidelines is the same as §3B1.1(b) in the 2000 Guidelines. Therefore, for the reasons discussed at Part IV.A.5 above, Defendant's offense level should be increased by three offense levels, pursuant to

---

[4](…continued)

> a document made or issued by or under the authority of the United States Government, a State, political subdivision of a State, a sponsoring entity of an event designated as a special event of national significance, a foreign government, political subdivision of a foreign government, an international governmental or an international quasi-governmental organization which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals . . . .

*Id.* § 1028(d)(3). The 11 blank I-94s ("Blank I-94s"), along with the foreign passports, and social security cards, recovered from Defendant's possession at the time of his arrest, *see* Hearing Exs. 170, 177-185, 187, are documents "issued by or under the authority of the United States Government . . . [or] a foreign government," 18 U.S.C. § 1028(d)(3), that contain codes and stamps used by such government to verify their authenticity, *see* H.R. Conf. Rep. No. 108-66, at 68. Specifically, the Blank I-94s contain 11-digit numeric codes in the top-left corner and each bears a stamp of "U.S. Immigration New York, N.Y. 2516." Hearing Ex. 170. Each of the social security cards and foreign passports bears either numeric codes or symbols purporting to relate to the issuing governmental authority; many are blank and one passport does not have a photograph attached. *See* Hearing Exs. 177-185, 187. For these reasons, the court finds Defendant's offense level should be increased by two offense levels, pursuant to §2B1.1(b)(10)(A)-(C)).

§3B1.1(b).  This brings Defendant's offense level to **17** under the 2007 Guidelines.

### C. *Acceptance of Responsibility*

Under both the 2000 Guidelines and the 2007 Guidelines, Defendant is entitled to a decrease of two offense levels for acceptance of responsibility.  The 2000 Guidelines and the 2007 Guidelines contain nearly identical provisions governing acceptance of responsibility.  The lone difference is that, under the 2007 Guidelines, a defendant is only eligible for a decrease of one additional level under §3E1.1(b) upon motion by the government.  *See* USSG §3E1.1(b) (2007).  Under the 2000 Guidelines, the court could grant the reduction without a motion by the government.  *See* USSG §3E1.1(b) (2000).  The difference is immaterial for present purposes, because the government did not move for an additional level and Defendant does not qualify for it.

Section 3E1.1(a) provides for a decrease of two offense levels in the event that a defendant "clearly demonstrates responsibility" for the offense.  USSG §3E1.1(a).  Further, the Commentary to §3E1.1 states:

> In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:
>
>> (a) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously

contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility;

(b) voluntary termination or withdrawal from criminal conduct or associations;

(c) voluntary payment of restitution prior to adjudication of guilt;

(d) voluntary surrender to authorities promptly after commission of the offense;

(e) voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;

(f) voluntary resignation from the office or position held during the commission of the offense;

(g) post-offense rehabilitative efforts (e.g., counseling or drug treatment); and

(h) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

*Id.*, cmt. (n.1).    The Application Notes further explain that

Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under §1B1.3 . . . will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a).  However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility.  A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.

*Id.*, cmt. (n.4(a)). In other words, although a defendant's guilty plea and the admission of the conduct comprising the offense and relevant conduct are strong indicators of acceptance of responsibility, such a defendant is not necessarily entitled to a decrease of two offense levels under §3E1.1. *United States v. Byrd*, 76 F.3d 194, 196 (8th Cir. 1996).

Defendant entered a guilty plea before trial, saving the government the time and expense of conducting a trial. Defendant has not frivolously denied relevant conduct. Defendant participated in a proffer session with the government. PSIR at ¶ 32. Therefore, the court finds that Defendant accepted responsibility for his conduct and is entitled to a decrease of two offense levels, pursuant to §3E1.1(a).

Defendant, however, does not qualify for a decrease of one additional level. On November 2, 2006, the court entered its Trial Management Order (docket no. 16), which stated that, for Defendant to qualify for the one additional level, he must notify the court no later than 15 court days in advance of the scheduled trial of an intent to plead guilty and enter a plea of guilty no later than ten court days in advance of the scheduled trial. Trial Management Order, at 7. Defendant entered his plea of guilty only five days in advance of the scheduled trial and after the government and the court expended significant resources on preparation for trial. *See* USSG §3E1.1(b).

Accordingly, a decrease of two offense levels is warranted under §3E1.1, and Defendant's adjusted offense level is **15** under both the 2000 Guidelines and 2007 Guidelines.

### D. Ex Post Facto Clause Analysis

The Eighth Circuit Court of Appeals states that "[a] violation of the [Ex Post Facto Clause] occurs . . . 'if a defendant is sentenced under the [Sentencing] Guidelines in effect at the time of sentencing when those [Sentencing] Guidelines produce a sentence harsher than one permitted under the [Sentencing] Guidelines in effect at the time the crime is committed.'" *United States v. Reetz*, 18 F.3d 595, 597-98 (8th Cir. 1994) (quoting

*United States v. Bell*, 991 F.2d 1445, 1452 (8th Cir. 1993)).  As indicated, Defendant's adjusted offense level is the same under both the 2000 Guidelines and 2007 Guidelines. Because Defendant is not subject to a harsher sentence under the 2007 Guidelines, the court deems it appropriate to apply the 2007 Guidelines.  *See* USSG §1B1.11(b)(1).

### E. *Criminal History Determination and the 2007 Sentencing Guidelines Range*

#### 1. *The court shall grant an upward departure for under-representation of Defendant's criminal history, pursuant to USSG §4A1.3(a)(1)*

The PSIR scores Defendant with three criminal history points.  PSIR at ¶ 58. Section 4A1.3 states, in part, that "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted."  USSG §4A1.3(a)(1).  The court, among other things, may consider "[p]rior similar adult criminal conduct not resulting in a criminal conviction." *Id*. §4A1.3(a)(2)(E).  The court must explain "the specific reasons why the applicable criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."  *Id*. §4A1.3(c)(1).  For example, a departure might be warranted if the defendant committed "the instant offense while on bail or pretrial release for another serious offense . . . ."  *Id*. cmt., (n.2(A)(iv)).

The Eighth Circuit Court of Appeals acknowledged that a court may properly take into account prior conduct that did not result in criminal convictions as part of a determination to grant an upward departure in a defendant's sentence.  *United States v. Sweet*, 985 F.2d 443, 446 (8th Cir. 1993).  It has approved of an upward departure if the prior similar adult criminal conduct was repetitive but not otherwise reflected in a defendant's criminal history calculation.  *United States v. Fawbush*, 946 F.2d 584, 587 (8th Cir. 1991).  The court may also base an upward departure upon a defendant's commission of the instant offense while awaiting trial for another offense.  *United States*

30

*v. Martha*, 915 F.2d 1220, 1222 (8th Cir. 1990). Reliable detail in a pre-sentence investigation report may be of use in considering such an upward departure. *See United States v. Roulliard*, 474 F.3d 551, 555 (8th Cir. 2007) (holding that the district court properly departed upward based on prior arrests that did not result in a criminal conviction because the pre-sentence investigation report described the arrests, and the circumstances giving rise thereto, in detail). Indeed, a court is entitled to consider "pending charges [if] the conduct underlying those charges is admitted." *United States v. Joshua*, 40 F.3d 948, 953 (8th Cir. 1994).

Defendant committed the instant offense as a fugitive; he walked away from the halfway house in the District of Minnesota prior to his trial in that district. PSIR at ¶ 21. After his arrest, Defendant admitted that he had assisted approximately eight customers in Tennessee, New York, Connecticut and Pennsylvania, since his flight from the Northern District of Iowa in 2001. *Id*. at ¶ 32. In addition to these admissions, Defendant was found in North Carolina with at least two dozen fraudulent identification documents, for which he was never separately charged (collectively, with the flight evidence, "Uncharged Conduct"). *Id*., at ¶ 30; *see also* Hearing Exs. 169-189.[5]

The Uncharged Conduct may serve as the basis for the §2B1.1(b)(9) & (10) enhancements discussed herein in Part IV.B.1 & 2 and a departure under §4A1.3. *See Thornberg*, 326 F.3d at 1027 (quoting *Saffeels*, 39 F.3d at 836)). The Uncharged Conduct properly reveals the seriousness of the offense, as reflected in the enhancements above for more than minimal planning, sophisticated means and relocation of the scheme. The Uncharged Conduct also provides clarity to Defendant's true criminal history and the

---

[5] However, the court notes that Defendant's prior scheme of, and conviction for, access device fraud, also known as "shoulder surfing" in Minnesota ("Minnesota Conviction"), PSIR, at ¶ 21, did not constitute relevant conduct for purposes of any of the sentencing enhancements discussed herein, and the court did not consider the Minnesota Conviction for purposes of the adjustment under §4A1.3.

likelihood of recidivism. These "dual considerations" indicate that Defendant's conduct may establish his offense level and provide a basis for a departure under §4A1.3(a)(1). *See id.*

In light of Defendant's own admission, the PSIR and the evidence discovered in Defendant's possession at the time of his arrest, the court has "reliable information [that indicates his] criminal history category substantially under-represents the seriousness of [his] criminal history or the likelihood that [he] will commit other crimes . . . ." USSG §4A1.3(a)(1); *see also Roulliard*, 474 F.3d at 555; *Joshua*, 40 F.3d at 953. Defendant committed the instant offense prior to his trial for offenses in the District of Minnesota. *See Martha*, 915 F.2d at 1222. Defendant was never sentenced or even charged for the Uncharged Conduct. *See Sweet*, 985 F.2d at 446. Defendant admitted that, after his flight from the Northern District of Iowa, he committed eight fraudulent documentation felonies. *See Fawbush*, 946 F.2d at 587. Each fraudulent document felony is arguably more serious than the instant offense of conviction.

For these reasons, the court finds that the addition of one criminal history point, for a total of four, is appropriate. *See* USSG §4A1.3(a)(4)(A) ("[T]he court shall determine the extent of a departure under this subsection by using, as a reference, the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's."). Four criminal history points places Defendant in **Criminal History Category III**. *See* USSG Ch. 5, Pt. A.

### 2. *Defendant's 2007 Sentencing Guidelines range*

For a defendant with an offense level of **15** and a **Criminal History Category III**, the 2007 Guidelines advise a sentence of 24 to 30 months. *See* USSG Ch. 5, Pt. A.

### F. *Adjustment and Departure Issues*

### 1. *The court shall not grant a downward departure, pursuant to USSG §5K2.16 or USSG §5K2.23*

Defendant asks the court for a downward departure, pursuant to §5K2.16 and

§5K2.23. Defendant carries the burden to show that he is entitled to a downward departure. *See Peters*, 464 F.3d at 812; *Lussier*, 423 F.3d at 843.

### a. USSG §*5K2.16*

Section 5K2.16 provides:

> If the defendant voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise, a downward departure may be warranted. For example, a downward departure under this section might be considered where a defendant, motivated by remorse, discloses an offense that otherwise would have remained undiscovered. This provision does not apply where the motivating factor is the defendant's knowledge that discovery of the offense is likely or imminent, or where the defendant's disclosure occurs in connection with the investigation or prosecution of the defendant for related conduct.

USSG §5K2.16 (2007). Defendant argues that he is entitled to a downward departure pursuant to §5K2.16, because he participated in a proffer interview and "disclosed additional conduct in other states of which the [g]overnment was not previously aware and not likely to become aware." Defendant's Memorandum (docket no. 101), at 6. The government does not respond to Defendant's argument.

The court recognizes that it has the authority to depart under §5K2.16, but it declines to do so. Defendant has not proven that the conduct he disclosed was unlikely to be discovered absent his proffer. Further, Defendant has not proven that the motivating factor in his decision to proffer with the government in October of 2004 (after he was convicted in Michigan but before the charges underlying such conviction were dismissed) was not in connection with the investigation or prosecution of Defendant for related

conduct.[6]

### b.    USSG §5K2.23

Section 5K2.23 provides:

> A downward departure may be appropriate if the defendant (1) has completed serving a term of imprisonment; and (2) subsection (b) of §5G1.3 (Imposition of a Sentence on a Defendant Subject to Undischarged Term of Imprisonment) would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing for the instant offense. Any such departure should be fashioned to achieve a reasonable punishment for the instant offense.

USSG §5K2.23. Defendant argues that he is entitled to a downward departure under §5K2.23, because he has served time for "shoulder surfing" in the United States District Court for the District of Minnesota. *See generally United States v. Elmardoudi*, 501 F.3d 935 (8th Cir. 2007) (affirming sentence of 51 months' imprisonment), *cert. denied*, 128 S. Ct. 926 (2008). Defendant represents to the court that the sentencing judge in Minnesota expressed a desire that the instant sentence run concurrently to the Minnesota sentence. The government does not respond to Defendant's argument.

The court recognizes that it has the authority to depart under §5K2.23, but it declines to do so. Assuming without deciding that Defendant "has completed serving a term of imprisonment", Defendant has not proven that §5G1.3(b) would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing for the instant offense. Section 5G1.3(b) provides:

---

[6] The court notes that it considered the proffer in deciding whether to grant Defendant acceptance of responsibility. *See, e.g., United States v. Sanders*, No. 00-1160, 2000 WL 1036339, *1 (8th Cir. July 28, 2008) (affirming district court's decision to deny defendant a downward departure under USSG §5K2.16 and characterizing the defendant's argument on appeal as frivolous, where district court considered conduct in deciding whether to grant acceptance of responsibility).

(b) If subsection (a) does not apply, and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of §1B1.3 (Relevant Conduct) and that was the basis for an increase in the offense level for the instant offense under Chapter Two (Offense Conduct) or Chapter Three (Adjustments), the sentence for the instant offense shall be imposed as follows:

(1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and

(2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.

(c) (Policy Statement) In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

USSG §5G1.3(a)-(c). Application Note 2(B) further provides that "[s]ubsection (b) does not apply in cases in which the prior offense increased the Chapter Two or Three offense level for the instant offense but was not relevant conduct to the instant offense under §1B1.3(a)(1), (a)(2), or (a)(3) . . . ." *Id.*, cmt. (n.2(B)). Application Note 3(A) grants the court broad authority for cases that do not fall into either §5G1.3(a) or (b). It states,

[u]nder subsection (c), the court may impose a sentence concurrently, partially concurrently, or consecutively to the undischarged term of imprisonment. In order to achieve a reasonable incremental punishment for the instant offense and avoid unwarranted disparity, the court should consider the

following:

(i) the factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));

(ii) the type (e.g., determinate, indeterminate/parolable) and length of the prior undischarged sentence;

(iii) the time served on the undischarged sentence and the time likely to be served before release;

(iv) the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and

(v) any other circumstance relevant to the determination of an appropriate sentence for the instant offense.

*Id.*, cmt. (n.3(A)).

Defendant committed the instant offense as a fugitive; he walked away from the halfway house in the District of Minnesota prior to his trial. PSIR, at ¶ 21. Section 5G1.3(a) is not applicable here, because Defendant was not serving a term of imprisonment when he committed the instant offense of conviction; he was a fugitive from pretrial supervision in the District of Minnesota. Section 5G1.3(b) is also inapplicable, because the Minnesota Conviction was not counted as relevant conduct. *See* USSG §5G1.3(b); *Oliver*, 2000 WL 1341532 at *1; *Lange*, 146 F.3d at 556. Because neither applies, a "sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." USSG §5G1.3(c); *see also Moore*, 160 F.3d at 511. The court deems it appropriate to impose a consecutive sentence, pursuant to §5G1.3(c).

In any event, the court does not believe it is appropriate to depart downward in this case under §5K2.23, because any such departure should be fashioned to achieve a

reasonable punishment for the instant offense. Any downward departure in this case would not achieve a reasonable punishment for the instant offense.

**2.      *The court shall not grant an upward departure for endangering national security, public health or safety, pursuant to USSG §5K2.14***

Section 5K2.14 states that, "[i]f national security, public health, or safety was significantly endangered, the court may depart upward to reflect the nature and circumstances of the offense." USSG §5K2.14. In interpreting §5K2.14, the Eighth Circuit Court of Appeals stated that

> a real, as opposed to an empty, threat must be present. *See, e.g.*, *United States v. Leahy*, 169 F.3d 433, 444 (7th Cir. 1999) (holding defendant's possession of ricin qualified for departure under [§5K2.14] given that substance's high toxicity, undetectable nature, incurable effects, and instability). While [a defendant's conduct may cause] a significant degree of apprehension amongst law enforcement officers . . . , apprehension is not the same as significant endangerment.

*United States v. Cole*, 357 F.3d 780, 784 (8th Cir. 2004); *cf. United States v. Vargas*, 73 F. App'x. 746 (5th Cir. 2003) (upholding an upward departure under §5K2.14 in which "[t]he court found that the selling of false social security cards to illegal aliens who hail from nations that are known to support terrorism placed the nation in great peril"). The Ninth Circuit Court of Appeals upheld a departure under §5K2.14 for a defendant's misuse of stolen armed forces identification cards, 100 of which were unaccounted for at the time of sentencing. *United States v. Todd*, 909 F.2d 395, 398 (9th Cir. 1990). The card would allow its bearer "to enter military installations and to have access to military equipment and classified information." *Id*.

Although the "significant endangerment" standard set forth in *Cole*, 357 F.3d at 784, is a permissive one, the government has not carried its burden in presenting evidence thereof, *Flores*, 362 F.3d at 1037 (stating that the government bears the burden to prove sentencing enhancements). The record contains evidence that troubles the court. Among

the items recovered from Hmimssa's rented storage locker were a Pakistani passport, Hearing Ex. 49, and a Palestinian passport, Hearing Ex. 75. PSIR, at ¶ 27. Defendant assisted customers who claimed in their social security applications to be from a number of countries of concern, including Sudan, Hearing Ex. 132, Palestine, Hearing Ex. 134, and Algeria, Hearing Ex. 148. PSIR, at ¶ 23. However, the government presented no evidence that Defendant or any of his customers posed "a real, as opposed to an empty, threat . . . ." *Cole*, 357 F.3d at 784. Put differently, these apprehensions are very different from concrete evidence of possession of ricin, *Leahy*, 169 F.3d at 444, or of a breach of military security, *Todd*, 909 F.2d at 398. For these reasons, the court declines to depart upward for endangering national security, under §5K2.14.

### 3. *The court shall grant an upward departure of nine offense levels for the seriousness of an underlying potential charge not pursued, under USSG §5K2.21*

Under §5K2.21,

> [a] court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range.

USSG §5K2.21. The government bears the burden to prove that an upward departure under §5K2.21 is appropriate. *Flores*, 362 F.3d at 1037.

The government pursues the upward departure based on a document that tallies fraudulent visas, Hearing Ex. 4A, and computer files of searches for personal information on the Internet and document files (collectively, "Storage Files"), Hearing Exs. 195-200. The Storage Files were found in Hmimssa's storage locker. PSIR at ¶ 27. The government did not pursue a charge against Defendant on the basis of the Storage Files, nor did the Storage Files provide a basis for any of the enhancements analyzed herein. *See*

Part IV.A & B.

The court holds that the government met its burden to prove that an upward departure under §5K2.21 is appropriate.[7] *Flores*, 362 F.3d at 1037 (stating that the government bears the burden to prove sentencing enhancements). The government has met the requirement under §5K2.21(1), and it has met the requirement under §5K2.21(2). The Storage Files have more than a "remote relationship" to the offense of conviction. *See Rogers*, 423 F.3d at 828. Defendant exercised control over the Storage Files; shortly after September 11, 2001, Defendant called Hmimssa and told him to destroy the documents and equipment related to their scheme. PSIR, at ¶ 26. Hmimssa did not do so; instead he moved all of the items, including the Storage Files, to a rented storage unit in Fairfax, Iowa. PSIR at ¶ 26. Defendant's relationship with the Storage Files provides a basis for an upward departure. The defendant in *United States v. Bell*, 243 F. App'x. 539 (11th Cir. 2007), was properly assessed an upward departure under §5K2.21 for passing 65 false checks over a four-year period. *Id*. at 543. The Eleventh Circuit Court of Appeals cautioned, in a false statement case, that uncharged conduct should "provide[] a basis for departure only if it sheds further light on the true nature of the offense of conviction[,] . . . rather [than] reflect[s] the seriousness of unproven allegations . . . ." *United States v. Ellis*, 419 F.3d 1189, 1193 (11th Cir. 2005). The Storage Files reveal the true scope of Defendant's criminal scheme, far beyond the offense of conviction, *i.e.*, misuse of a fraudulently obtained social security number; the Storage Files evidence an ongoing scheme to forge and sell increasingly sophisticated fraudulent identification documents. *See Bell*, 243 F. App'x. at 543. Therefore, the court shall depart upward for the seriousness of an underlying potential charge not pursued, under §5K2.21. The advisory Sentencing Guidelines simply fail to account for the sheer number of fraudulent

---

[7] The same analysis set forth in this section would also provide a basis for an upward departure of identical extent under §5K2.0.

documents for which Defendant is responsible. Indeed, a conservative estimate of the number of fraudulent documents at issue for the §5K2.21 analysis is 140. *See* PSIR at ¶ 31 n.2; *id.* at ¶ 101.

The court must decide the extent of the upward departure. In *United States v. Mack*, 452 F.3d 744 (8th Cir. 2006), the Eighth Circuit Court of Appeals provided useful guidance. *See, e.g., United States v. Bradford*, 461 F. Supp. 2d 904, 924-26 (N.D. Iowa 2006) (following *Mack* analysis), *aff'd*, 499 F.3d 910 (8th Cir. 2007), *cert. denied*, 2008 WL 482064 (U.S. Feb. 25, 2008).

In *Mack*, the defendant pled guilty to one count of sexual abuse of a minor, in violation of 18 U.S.C. § 2243. 452 F.3d at 745. As part of a plea agreement, the government dismissed a possession of child pornography count, in violation of 18 U.S.C. § 2252A(a)(5)(A). *Id.* The defendant had sex with the minor and made a videotape of some of the sex. *Id.* The defendant's advisory Sentencing Guidelines range on the count of conviction was 30 to 37 months. *Id.* The court departed upward to 51 months under §5K2.21 because of the dismissed possession of child pornography count. *Id.* In arriving at the appropriate figure, the district court calculated the defendant's hypothetical advisory Sentencing Guidelines for the dismissed possession of child pornography count. *Id.* The district court determined that the defendant's hypothetical advisory Sentencing Guidelines range would have been 51 to 63 months' imprisonment,[8] and it sentenced the defendant at the bottom of this hypothetical range. *Id.* The Eighth Circuit Court of Appeals held that this was a permissible analysis for determining the extent of an upward departure pursuant to §5K2.21. *Id.* at 745-47. The Eighth Circuit Court of Appeals also held that, on the facts of the case, the resulting sentence was reasonable. *Id.* at 547. It affirmed the

---

[8] The district court in *Mack* disregarded a cross-reference that would have "enhanc[ed] [the defendant's] sentence more than either [the defendant] or the government anticipated." *Mack*, 452 F.3d at 745.

sentence. *Id.*

The court finds that a similar analysis is appropriate here.[9] Application Note 9(B) to §2B1.1 explains:

> Offenses involving authentication features, identification documents, false identification documents, and means of identification, in violation of 18 U.S.C. § 1028, also are covered by this guideline. If the primary purpose of the offense, under 18 U.S.C. § 1028, was to violate, or assist another to violate, the law pertaining to naturalization, citizenship, or legal resident status, apply §2L2.1 (Trafficking in a Document Relating to Naturalization) or §2L2.2 (Fraudulently Acquiring Documents Relating to Naturalization), as appropriate, rather than this guideline.

USSG §2B1.1, cmt. (n.9(B)). At first blush, §2L2.1 or §2L2.2 may appear to be of little relevance. First, Defendant's offense of conviction was not under § 1028. Second, the application of §2L2.1 to Defendant's offense conduct would surely have raised Ex Post Facto Clause concerns, because §2L2.1 was not promulgated until November 1, 2006—over five years after Defendant's offense of conviction. *See* USSG §2L2.1; PSIR, at ¶ 99 (listing enhancements that, even absent the role in the offense enhancement, would assess Defendant an offense level of 28).

However, "[w]hile [the] court cannot retrospectively apply enhancing amendments to the [Sentencing Guidelines] in order to calculate the defendant's guidelines range, such amendments are instructive as to whether a sentence outside of the [Sentencing Guidelines] falls within the range of reasonableness." *United States v. Meyer*, 452 F.3d 998, 1001-02 (8th Cir. 2006); *see also United States v. Larrabee*, 436 F.3d 890, 894 (8th Cir. 2006)

---

[9] The court does not suggest that the *Mack* analysis is the only analysis appropriate for determining the extent of a §5K2.21 departure. The court acknowledges that, in some cases, a hypothetical advisory Sentencing Guidelines sentence will not be available or may be inappropriate. The benefit of the *Mack* analysis, of course, is that it provides district courts with a reasoned basis for a specific extent of departure that is consistent with the express policy findings of the Sentencing Commission.

(holding that "amended guidelines" are "instructive" as to reasonableness of sentence). Indeed, "subsequent [Sentencing Guidelines] can be a useful touchstone in making the determinations of reasonableness called for in upward departure cases." *Saffeels*, 39 F.3d at 838. The Tenth Circuit Court of Appeals held, even more forcefully, that "[s]o long as the court makes clear its understanding that a subsequently enacted guideline does not govern, it is *per se* reasonable for the court to consider it." *United States v. Tisdale*, 7 F.3d 957, 967 (10th Cir. 1993) (emphasis in original).

If, hypothetically, Defendant's offense conduct were analyzed under §2L2.1(b)(2), the court would increase Defendant's offense level by nine levels. *See* §2L2.1(b)(2) (noting that, for offense conduct "involv[ing] six or more documents or passports, increase as follows: [the number of documents/passports is] (A) 6-24 add **3** [offense levels]; [the number of documents/passports is] (B) 25-99 add **6** [offense levels]; and [the number of documents/passports is] (C) 100 or more add **9** [offense levels]" (emphasis in original)). Based on the record, the court finds that Defendant is responsible for more than 100 documents or passports, and, if §2L2.1(b)(2) applied, the Storage Files meet the §2L2.1(b)(2)(C) threshold.

For these reasons, the court shall depart upward nine offense levels for the seriousness of an underlying potential charge not pursued, pursuant to §5K2.21. This brings Defendant's total offense level, after departures, to **24**. As previously determined, Defendant is a **Criminal History Category III**. Although Defendant's advisory Sentencing Guidelines range is 63 to 78 months of imprisonment, the statutory maximum on the count of conviction is five years of imprisonment. Accordingly, **Defendant's advisory Sentencing Guidelines range is 60 months**.

## V. CONCLUSION

Defendant's base offense level under §2B1.1 is **6**. Additionally, the court increased Defendant's offense level to **12** pursuant to §2B1.1(b)(9), increased Defendant's offense

level by **two** levels pursuant to §2B1.1(b)(10), increased Defendant's offense level by **three** levels pursuant to §3B1.1 and decreased Defendant's offense level by **two** levels pursuant to §3E1.1. The court deemed it appropriate to **grant** the government's motion for an adjustment pursuant to §4A1.3(a), adding an additional criminal history point and, thereby, increasing Defendant's **Criminal History Category to III**. Therefore, the court found Defendant's total offense level before any departures to be **15**, and his Criminal History Category to be **III**. The court then deemed it appropriate to **deny** Defendant's requests for downward departures pursuant to §5K2.16 and/or §5K2.23. The court also deemed it appropriate to **deny** the government's motion for upward departure pursuant to §5K2.14. Finally, the court deemed it appropriate to **grant** the government's motion for an upward departure, pursuant to §5K2.21, and increased Defendant's offense level by **nine**, which increased Defendant's total adjusted offense level to **24**. **Defendant's advisory Sentencing Guidelines range is 60 months**, the statutory maximum for the offense of conviction.

**IT IS SO ORDERED.**

**DATED** this 12th day of March, 2008.


LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA